IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRYANT COLLINS, DAVID COONS, )
CHARLES DALE, STEVEN DAVIS, JAMES )
DUNCAN, HAROLD FINKEL, VICTOR )
FRICAS, THOMAS GAZDZIAK, GREGORY )
GIFFORD, ALLAN GRAHAM, STEVEN )
GRUNDON, JULIUS HALLER III, JOSEPH )
HOLD, JAMES HYLAND, JAMES JENKS, )
DAVID KEENAN, JEFFREY KNAUS, )
MICHAEL McFARLAND, STEVEN )    Case No. 05 C 04386
McFARLAND, ANDREW MITZEN, )
CHARLES NEFF, KEITH OLENEK, LYSSA )
KAYE PAUL, MICHAEL POISELLA, )    **SECOND AMENDED COMPLAINT**
THOMAS PRENDERGAST, DEAN PROKOS, )
MICHAEL ROSS, PAUL SANFILIPPO, )
JEFFREY SCHWIERING, JOSEPH )
SCOZZAFAVA, ROBERT SIBIK, MARK )    Honorable Judge Wayne R. Andersen
STACHULSKI, CHARLES STEVENS, )
THOMAS VALLONE, GREGORY WEISS, )    Jury Demand
BRADFORD WHEATLEY, JEFFREY )
WOLINSKI, IRA WOOLWICH )
)
               Plaintiffs, )
)
   v. )
)
NICHOLAS K. PONTIKES, WILLIAM N. )
PONTIKES, ROBERT A. BARDAGY, )
THOMAS H. PATRICK, C. KEITH HARTLEY,)
JOHN F. SLEVIN, CAROLYN L. MURPHY, )
RICHARD KASH, HARRY M. JANSEN )
KRAMER, JR., JOHN J. VOSICKY, and JP )
MORGAN CHASE BANK, N.A. )
)
              Defendants. )

       Plaintiffs, Bryant Collins, David Coons, Charles Dale, Steven Davis, James Duncan,

Harold Finkel, Victor Fricas, Thomas Gazdziak, Gregory Gifford, Allan Graham, Steven

Grundon, Julius Haller III, Joseph Hold, James Hyland, James Jenks, David Keenan, Jeffrey

Knaus, Michael McFarland, Steven McFarland, Andrew Mitzen, Charles Neff, Keith Olenek,

Lyssa Kaye Paul, Michael Poisella, Thomas Prendergast, Dean Prokos, Michael Ross, Paul

Sanfilippo, Jeffery Schwiering, Joseph Scozzafava, Robert Sibik, Mark Stachulski, Charles

Stevens, Thomas Vallone, Gregory Weiss, Bradford Wheatley, Jeffrey Wolinski, Ira Woolwich, by and through their undersigned counsel, bring their Complaint against Defendants Nicholas K. Pontikes, William N. Pontikes, Robert A. Bardagy, Thomas H. Patrick, C. Keith Hartley, John F. Slevin, Carolyn L. Murphy, Richard Kash, Harry M. Jansen Kramer, Jr. and John J. Vosicky, (jointly referred to as "the Board of Directors"), and JP Morgan Chase Bank, N.A., as successor to Bank One and the First National Bank of Chicago ("Bank One")(collectively referred to as "Defendants").

## BASIS FOR THE ALLEGATIONS

1.      Plaintiffs' allegations are based upon personal knowledge and upon investigation, which included a review of United States Securities and Exchange Commission ("SEC") filings by Comdisco, Inc. ("Comdisco"), as well as certain regulatory filings and reports, securities analyst's reports and advisories about Comdisco, and public statements issued by and/or about Comdisco, including Comdisco press releases.   Plaintiffs' allegations are also based on conversations Comdisco officers and directors had with Comdisco employees during employee meetings, some of which were taped by Comdisco.   Plaintiffs' investigation also included a review of documents filed in connection with Comdisco's bankruptcy proceedings and Plaintiffs' counsel, Davis McGrath LLC's participation in that bankruptcy on behalf of certain participants in the Comdisco Shared Investment Plan ("SIP").   Plaintiffs' investigation also included interviews with individuals, including former executives and other employees of Comdisco, knowledgeable about the matters alleged in this Complaint.   Plaintiffs allege as follows:

## NATURE OF THE ACTION

2.      The Board of Directors of Comdisco, with the active assistance, and in concert with Bank One Corporation, coerced and fraudulently induced Plaintiffs, all Comdisco employees, to buy over $100 million of stock from Comdisco through the SIP program and become SIP Participants.   That stock is now nearly worthless.   As if that were not bad enough,

the purchase of the stock was financed by five year negatively amortized unsecured loans to the employees for 100% of the purchase price from Bank One in a transaction structured in a manner to conceal that it was an illegal margin purchase of securities. In reality, the scheme was nothing more than a way for Comdisco to finance its business operations at no cost to itself and by placing the ultimate obligation of repayment upon the backs of its employees, as well as to raise the price of Comdisco stock. In carrying out their scheme, Defendants failed to disclose material information regarding the SIP transaction, including the illegality of the transaction itself. After selling the Comdisco stock to the Plaintiffs, Defendants further coerced and fraudulently prevented the Plaintiffs from selling the stock and mitigating at least some of their damages. Unfortunately, the scheme was quite successful and Defendants coerced the employees to borrow an average of approximately $1 million each to buy the now nearly worthless stock. In planning, promoting, and carrying out this scheme, Defendants disregarded, to the ultimate detriment of Plaintiffs, any and all financial standards and criteria, including margin regulations, which lenders have long applied to such transactions as well as the fact that many, if not all Plaintiffs, already had substantial holdings of Comdisco stock by and through benefit, bonus, and stock option plans with Comdisco. The wholesale disregard of such circumstances constituted a breach of the fiduciary duties owed to Plaintiffs by Defendants.

### **Jurisdiction and Venue**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, as this action is based in part upon the securities laws of the United States.

4. This Court has subject matter jurisdiction over the remaining causes of action in this Complaint based on 28 U.S.C. §1367, as those claims are so related to the securities claims alleged herein that they form part of the same case or controversy.

5. Personal jurisdiction and venue is proper in the Northern District of Illinois pursuant to stipulation of the parties, and an order from the Northern District of California dated July 25, 2005 transferring this case to the Northern District of Illinois in accordance with 28

U.S.C. §1404(a).

### The Parties

6.     Plaintiffs, David Coons, Charles Dale, Steven Grundon, Joseph Hold, Jeffrey Knaus, Lyssa Kaye Paul, Jeffrey Schwiering, and Gregory Weiss are residents of the State of California and purchased Comdisco stock during the relevant period of time as part of the SIP program and have not sold or assigned the stock.

7.     Plaintiffs, Steven Davis, Victor Fricas, Thomas Gazdziak, Gregory Gifford, James Hyland, David Keenan, Lawrence Mitzen, Charles Neff, Dean Prokos, Michael Ross, Robert Sibik, Mark Stachulski, Charles Stevens, Thomas Vallone, Bradford Wheatley, Jeffrey Wolinski, and Ira Woolwich are residents of the State of Illinois and purchased Comdisco stock during the relevant period of time as part of the SIP program and have not sold or assigned the stock.

8.     Plaintiffs, Bryant Collins and Harold Finkel are citizens of the State of Texas and purchased Comdisco stock during the relevant period of time as part of the SIP program and have not sold or assigned the stock.

9.     Plaintiffs, James Duncan, Michael Poisella, and Joseph Scozzafava are residents of the State of Connecticut and purchased Comdisco stock during the relevant period of time as part of the SIP program and have not sold or assigned the stock.

10.     Plaintiff, Allan Graham, is a resident of the State of New Jersey and purchased Comdisco stock during the relevant period of time as part of the SIP program and has not sold or assigned the stock.

11.     Plaintiffs, Julius Haller III and Paul Sanfilippo, are residents of the State of Georgia and purchased Comdisco stock during the relevant period of time as part of the SIP program and have not sold or assigned the stock.

12.     Plaintiff, James Jenks, is a resident of the State of Arizona and purchased Comdisco stock during the relevant period of time as part of the SIP program and has not sold or assigned the stock.

13. Plaintiff, Stephen McFarland, is a resident of the State of Wisconsin and purchased Comdisco stock during the relevant period of time as part of the SIP program and has not sold or assigned the stock.

14. Plaintiff, Michael McFarland, is a resident of the State of Minnesota and purchased Comdisco stock during the relevant period of time as part of the SIP program and has not sold or assigned the stock.

15. Plaintiff, Keith Olenek, is a resident of the State of Florida and purchased Comdisco stock during the relevant period of time as part of the SIP program and has not sold or assigned the stock.

16. Plaintiff, Thomas Prendergast, is a resident of the State of Michigan and purchased Comdisco stock during the relevant period of time as part of the SIP program and has not sold or assigned the stock.

17. All Plaintiffs are Comdisco employees who purchased Comdisco shares pursuant to the SIP in January and February 1998, and who are still owners of such shares, which under Comdisco's confirmed plan of reorganization have been converted to Contingent Distribution Rights.

18. Defendant JP Morgan Chase Bank, N.A. is a Delaware corporation with its principal place of business in New York, New York. JP Morgan Chase Bank N.A. has been named as a defendant in this action based on the actions of First National Bank of Chicago, the predecessor to Bank One and as a result of the holding company merger between JP Morgan Chase and Bank One.

19. Defendant Nicholas Pontikes is a resident of the State of Illinois and was at all times relevant to this action a member of the Board of Directors of Comdisco, as well as being the son of its founder and its largest single shareholder controlling approximately 24 % of the stock in Comdisco. Nicholas Pontikes resigned as CEO and President of Comdisco on December 20, 2000.

20. Defendant William Pontikes is a resident of the State of Illinois and was at all

times relevant to this action a member of the Board of Directors and an officer of Comdisco. He controlled 3% of the stock in Comdisco.

21.    Defendant Robert A. Bardagy is a resident of the Province of British Columbia and was at all times relevant to this action a member of the Board of Directors of Comdisco.

22.    Defendant Thomas H. Patrick is a resident of the State of Illinois and was at all times relevant to this action a member of the Board of Directors of Comdisco.

23.    Defendant C. Keith Hartley is a resident of the State of Connecticut and was at all times relevant to this action a member of the Board of Directors of Comdisco and a Plan Administrator of the SIP.

24.    Defendant John F. Slevin is a resident of the State of Illinois and was at all times relevant to this action a member of the Board of Directors and an officer of Comdisco.

25.    Defendant Carolyn L. Murphy is a resident of the State of Illinois and was at all times relevant to this action a member of the Board of Directors of Comdisco and a Plan Administrator of the SIP.

26.    Defendant Richard Kash is a resident of the State of Illinois and was at all times relevant to this action a member of the Board of Directors of Comdisco and a Plan Administrator of the SIP.

27.    Defendant Harry M. Jansen Kramer, Jr. is a resident of the State of Illinois and was at all times relevant to this action a member of the Board of Directors of Comdisco and a Plan Administrator of the SIP.

28.    Defendant John J. Vosicky is a resident of the State of Illinois and was at all times relevant to this action a member of the Board of Directors of Comdisco. Until July, 2001, John Vosicky was CFO and Executive Vice President of Comdisco.

29.    Comdisco was a corporation organized under the laws of the State of Delaware, with its principal place of business and its corporate headquarters located in Rosemont, Illinois.

## BACKGROUND FACTS

30.    Comdisco was a global technology leasing and services company founded by Kenneth Pontikes in 1969, whose shares have been publicly traded on the New York Stock Exchange ("NYSE").

31.    Comdisco's core business had been high technology equipment leasing and business continuity services through which Comdisco provided facilities so that its clients could rapidly access computer data that was lost or inaccessible.

32.    Comdisco's core businesses were extraordinarily successful and the value of Comdisco's shares trading on the NYSE reflected the success of its business up until 2000.

33.    Kenneth Pontikes had intended that his son, Nicholas Pontikes, eventually succeed him as CEO of Comdisco.  However, in 1994 with the unexpected death of Kenneth, the Board of Directors had determined that 29 year old Nicholas was not experienced enough to take that role with Comdisco at that time. Nevertheless, in 1999, only 5 years later, with the unexpected retirement of Jack Slevin as CEO, Nicholas Pontikes at the age of 34 was named Chief Executive Officer of Comdisco.

34.    Comdisco filed for bankruptcy protection on July 17, 2001 and is now operating under its confirmed plan of reorganization.

## A Summary Of The Fraudulent And
## Coerced Shared Investment Plan (SIP) Scheme

35.    At least as early as the second quarter of 1997, Comdisco's Board of Directors, beginning with Harry Jensen Kramer, Jr. and Nicholas Pontikes, began discussing working with Bank One on a scheme to induce the Plaintiffs and other Comdisco employees to purchase substantial amounts of Comdisco stock pursuant to a so-called shared investment plan, or "SIP." Harry Jensen Kramer, Jr. ("Kramer") at the time was a senior executive at Baxter International, Inc. ("Baxter") which had instituted a shared investment plan with Bank One.  Kramer was familiar with the conditions under which the Baxter plan was offered to the Baxter employees. This scheme was tabled by the Comdisco Board of Directors during the summer of 1997 as it

was perceived by most to be too risky for the individual Comdisco employees.

36. These risks were disregarded, however, in January 1998 when Comdisco's Board of Directors, in concert with Bank One, revived the scheme to willfully and fraudulently induce and coerce the Plaintiffs to purchase over $100 million of Comdisco stock in order to provide an off-balance sheet loan to fund Comdisco's operations, to increase the stock price, and limit the employees' ability to leave Comdisco. Prior to even determining the interest of the employees, the Board of Directors and Bank One established a target of at least $80 million and perhaps as high as $100 million and designed a program to coerce the employees to meet this target.

37. The basic concept of the SIP scheme, as devised and instituted by the Board of Directors and Bank One, was to create circumstances in which targeted employees would be pressured to borrow substantial sums of money in order to purchase large amounts of Comdisco stock under conditions that denied them the ability to give meaningful consideration to the huge personal financial obligations they were assuming or to the fact that many, if not all of the Plaintiffs hold shares of Comdisco stock through the company sponsored plans and were not diversified in their investments. In fact, that is what Comdisco did – sequestering the employees at a corporate retreat, giving them only 48 hours to decide to make the substantial investments or not, not allowing them to discuss the program with each other, making it virtually impossible to discuss it with advisors, and making it clear that their future with the company depended on their participation in the program. The five-year negatively amortized loans that employees were coerced into assuming were far in excess of the personal financial risk that a bank would approve in a legitimate unsecured personal lending situation. The only credit-worthy party for an unsecured transaction of this size was Comdisco. The Board of Directors and Bank One knew that the Comdisco SIP would be offered for Comdisco employees to consider during a time period that was inadequately short as compared with the longer time period for consideration provided to the employees in other SIP programs and that the average amount of the loans in other SIP programs were for significantly less money.

38. In addition to the high pressure "sales" tactics, both the Board of Directors and

8

Bank One also made affirmative misrepresentations about the nature, scope and risk of the SIP program. For example, Defendants knowingly misrepresented that the SIP loans were not margin loans, failed to disclose that the SIP transaction was illegal, and withheld material information about the risks involved in the program and the way it differed from other SIP programs.

39. The SIP program was also structured so that once the targeted employees were pressured and induced to borrow money to buy SIP shares, they were effectively prevented from selling the shares. Among other things, the SIP shares were restricted shares which substantially impaired the ability of employees to sell the shares to repay the loans. Also, the SIP program was structured so that any employee who sold any of the SIP stock, or left the employment of Comdisco, in the first three years of the program had to surrender 50% of the profits to Comdisco, yet bear 100% of the risk. Furthermore, the Board of Directors, and certain persons reporting to them, coerced and pressured SIP participants not to sell the SIP shares after they were bought. These actions all had the effect of denying the employees the ability to sell the SIP shares to repay the loans when the price of Comdisco's stock began to decline.

40. The purpose of Defendants' fraudulent SIP scheme was to allow Comdisco's Board to raise over $100 million at little or no cost to Comdisco without recognizing the liability on its books and to inflate its stock price. Had Comdisco raised $100 million by selling stock in the marketplace, the sale of $100 million worth of stock would have depressed the market price of the stock. Had Comdisco borrowed the money itself, then it would have to pay interest and eventually repay the money and reflect the liability on its books. However, through the coercive SIP program, the Board of Directors was able to shift the entire cost of the financing to individual Comdisco employees and avoid a market-depressing flood of new shares on the market. The program was used to artificially inflate the market price of Comdisco's stock in two ways. First, the Board of Directors knew in advance that announcement of a large SIP program would increase the stock price. This was achieved by the Board of Directors being able to represent to the public that senior Comdisco employees had voluntarily made huge personal

purchases of Comdisco stock at its highest price levels. In fact, the Board of Directors omitted to disclose to the public the fact that the SIP purchases had been made under coercive and fraudulent circumstances. Second, the Board was able to use the proceeds of the SIP to repurchase Comdisco shares on the open market – which caused the price of the stock to increase even more. All of this was accomplished without reflecting the liability on its books.

42. By using the coercive practices described herein, the Board of Directors was also able to place its senior employees in a position of unreasonable risk in a manner that gave the employer substantial additional unfair leverage over the employees' continued employment at Comdisco.

42. Bank One stood to obtain at least three separate benefits from the SIP program. First, Bank One obtained the opportunity to lend over $100 million at market rates in a transaction with the borrowers that was in fact principally supported by the guaranty of Comdisco and the stock. Bank One knew or should have known that the credit of the individual employee borrowers was insufficient to justify such lending. Second, by completing a SIP program at Comdisco, Bank One was in a position to further successfully market its SIP programs to other corporations. Third, by helping Comdisco's Board of Directors to facilitate the SIP program, Bank One obtained the opportunity to promote the marketing of further banking business to Comdisco.

43. Comdisco received over $100 million dollars in cash from the SIP scheme. As planned, the creation of the SIP program maintained and inflated the value of Comdisco Stock. Bank One received guaranteed notes in excess of $109 million dollars, which, with interest, now total in excess of $156 million dollars. In July, 2001 Comdisco filed bankruptcy which left the shares purchased by Plaintiffs practically worthless. In December, 2004, Comdisco paid Bank One approximately $126,000,000 to satisfy its guarantee of the SIP loans. Although Comdisco kept the SIP loan proceeds for over six years and still controls the SIP stock, Comdisco, through its litigation trustee, has filed suit seeking repayment of the SIP loans from all Plaintiffs.

**The Coercive SIP Scheme Was
Effectuated At The Retreat In Palm Springs Retreat and
Private Employee Week-End Meetings**

44.     In order to effectuate its coercive and fraudulent SIP scheme, the Board of Directors, with the knowledge, consent and participation of Bank One, arranged for the presentation of the SIP at the annual "weekend retreat" for senior Comdisco employees at a resort in Palm Springs, California and mandatory telephonic participation in the meetings for those not in Palms Springs (the "Retreat").  Comdisco invited selected Comdisco employees including numerous worldwide employees to Palm Springs for the Retreat, at which these employees were treated to golf outings, lavish meals and unlimited amounts of alcoholic refreshments.  The employees who attended this annual event expected the retreat to be the usual extended party and celebration of Comdisco's success and an opportunity to praise the outstanding individual performers as opposed to a meeting where serious business would be conducted.

45.     Instead of being the traditional celebratory event, the Retreat was designed and structured to pressure employees to participate in the SIP, which the employees learned about for the first time at the Retreat.  For those employees who could not attend at Palm Springs, the Board of Directors arranged for them to participate in the SIP presentations through closed circuit televised meetings with audio and video connections throughout the world, while some participated only by telephone. The combination of pressure at Palm Springs and mandatory telephonic meetings was part of Comdisco's design to pressure the employees into participation in the SIP program

46.     During the Retreat, Nicholas Pontikes and several other members of the Board of Directors induced, persuaded and cajoled employees into participating in the SIP.  The SIP was represented by the Board of Directors to be a significant financial opportunity, whereby the employees each could purchase Comdisco common stock at then-current market prices, financed one hundred percent through the execution of loan agreements guaranteed by Comdisco, with extremely low front end interest charges which the stock dividends paid.  The SIP presentation,

11

along with the documentation, was prepared with the advice and approval of Bank One.

47.     The SIP program required that each participant to borrow 100 percent of the value of the shares through Bank One.  A participant was not allowed to go to a different bank or pay for the SIP shares in any other manner.  This was done so that the SIP participants would not learn that the loans were illegal margin transactions, and because the Board of Directors and Bank One knew, or should have known, that the SIP participants could not get such excessive supposedly unsecured personal loans from other banks.

**Defendants Used Oppressive Tactics
To Force Unreasonable SIP Purchases**

48.     The Board of Directors and Bank One knew that it was important for potential SIP participants to "carefully review all information presented" at the Retreat because of the magnitude of the personal loans that were being aggressively promoted by the Board of Directors.  Nonetheless, the Board of Directors structured the Retreat to assure that such careful review by each participant would be difficult or impossible to conduct.

49.     The participants at the Retreat and the Plaintiffs were effectively denied the ability to make rational business decisions as to whether to invest in the SIP by each and all of the following oppressive methods and techniques employed by the Board of Directors:

(a)     requiring Plaintiffs at the during the Retreat to make a major personal financial commitment and assume a five (5) year negatively amortized unsecured personal loan, with less than 48 hours to decide, when the Board of Directors and Bank One knew that participants in similar programs had substantially more time to make such an important financial decision in a plan that was more favorable to the employees;

(b)     providing information that was false and misleading which could not be or have been reasonably discovered without substantial review by third party professionals.

(c)     effectively precluding Plaintiffs at the Retreat from consulting with legal counsel or their financial advisors both due to the extremely short time constraint and also due to the fact that

the significant investment decision had to be made during one weekend;

    (d)    directing Plaintiffs at the Retreat not to discuss their decisions whether to participate in the SIP with each other;

    (e)    requiring Plaintiffs to read, digest, acknowledge and accept scores of pages of complex plan documents, involving complex legal, tax and financial issues, without having been afforded adequate time to read them;

    (f)    intentionally distracting Plaintiffs from prudently considering the advisability of participation in the SIP by required social activities that included the consumption of alcohol;

    (g)    repeatedly threatening that failure to participate in the SIP would reflect adversely on the Plaintiffs' loyalty to Comdisco and Nicholas Pontikes and thereby jeopardize their positions at Comdisco and the years of dedicated and loyal service that the Plaintiffs had already invested; and

    (h)    otherwise wrongfully pressuring Plaintiffs to participate in the SIP.

### Misrepresentations Made To Induce SIP Participation

    50.    In addition to improperly pressuring Plaintiffs to participate in the SIP program, Defendants also made a number of false representations to induce the employees' participation. The Board of Directors, with the knowledge and participation of Bank One, falsely represented that the SIP loans were not margin loans, when in fact they were. In addition, the Board of Directors and Bank One concealed that the SIP loans also violated Regulations U and G of the Federal Securities laws which regulated margin transactions. In fact, following its bankruptcy, Comdisco filed reports with the Securities and Exchange Commission admitting that the SIP violated both federal regulations. In misrepresenting the true nature of the loans, Defendants concealed from Plaintiffs: (1) the fact that Plaintiffs were participating in an illegal transaction; and (2) the fact that there is an entire federal regulatory framework designed to prevent just the sort of loans being foisted upon Plaintiffs. In other words, Defendants concealed the fact that the federal government has determined that it is against public policy for loans to be extended for

more than at most 50% of the value of securities precisely because it places individuals in far too risky a financial position. Had this information not been concealed, Plaintiffs would have been alerted to the extraordinarily unfair terms of the SIP program and given them a basis to decline to participate.

51. The Board of Directors, with the knowledge and participation of Bank One, falsely represented that Comdisco stock would not be used to secure or collateralize the SIP loans.

52. The Board of Directors and Bank One created a complex structure that camouflaged the fact that: a) the stock was effectively used as security for the loans, which made these margin transactions, and b) the transaction amounted to an "off balance sheet" loan to Comdisco. The structure was as follows. Since the employees did not have the credit capacity to support a five year negatively amortized unsecured loan, Bank One obtained a guarantee from Comdisco for the SIP loan to the employee. At the same time, as an integral part of the overall transaction, Comdisco physically retained the stock certificates representing the stock purchased from the SIP Loan proceeds and held those certificates until the loan was repaid, so that Comdisco and Bank One were protected by the stock until the loans were paid and the guarantee was released. As a result, the stock collateralized the loan through the guarantee and Bank One could look to both the guarantee and to the stock as a source of repayment. At no time, other than in connection with complete repayment of the loan, could the SIP participant freely trade in the Comdisco stock purchased by the allegedly unsecured SIP loan. The Board of Directors and Bank One were aware that the representations made in connection with the SIP offering were false, that the stock was used to secure the loan and that the SIP loan was, contrary to their statement, a margin loan. The normal disclosure, warnings and documentation for margin transactions were missing, including the U1 Forms.

53. The Board of Directors, with the knowledge and participation of Bank One, falsely represented that the SIP was an employee perk and incentive compensation plan. In fact, the SIP scheme was principally a mechanism to provide a no-cost "off balance sheet" financing

of over $100 million to Comdisco as a means to artificially inflate the price of Comdisco's stock, and a device to obtain more leverage over the employees.

54.     Bank One, with the knowledge and participation of the Board of Directors, falsely represented that it would review the financial condition of each loan applicant to determine personal financial suitability for what was represented to be an unsecured loan applied for by each employee.  In fact, Bank One at all times never intended to make a meaningful review, if any, of the employees' financial circumstances.  Bank One did not reject a single SIP participant's application, leaving the SIP Participants overexposed with significant risk.

55.     The Board of Directors falsely represented that it "significantly weighed [each employee's] ability to assume the substantial personal financial risk that is associated with this [SIP] program."  This representation was false, in that there was no "significant weighing" of the individual personal financial situation of any Plaintiff.  The only consideration of financial risk was superficially based on compensation and not on any significant analysis of personal financial condition or the amount of Comdisco stock the employee held through other Comdisco plans. That this limited and largely irrelevant criterion was the only criteria considered was also not disclosed.  The Board of Directors thereby lulled the SIP participants into a false sense of security that both the Board of Directors and Bank One had made substantial, meaningful and sophisticated individual valuations of the capacity of the each employee to assume the respective SIP loans.  This was bolstered by the representation that Comdisco had "the right to accept or reject [SIP] participations in whole or in part."  As financial institutions in the business of extending credit, underwriting was a core competency of both Bank One and Comdisco. Nevertheless neither Comdisco nor Bank One conducted any industry standard credit due diligence.  The Board of Directors and Bank One were aware of the financial risk to the individual SIP Participants prior to the approval of the SIP but lulled them into a false sense of security by representing that individual financial suitability would be considered.

56.     The Board of Directors and Bank One failed to disclose that the Baxter plan and other shared investment plans, which had been the plans that stimulated the institution of the SIP

by the Board of Directors and Bank One, were presented to employees with significantly more time to consider the financial obligation, had the added benefit of provisions that limited loss and were significantly smaller in size and risk. Had these material disclosures been made, the employees would have been aware that the Board of Directors and Bank One were improperly coercing them.

57. Notwithstanding written statements to the contrary, in order to pressure and induce employees to participate, the Board of Directors represented to the Comdisco employees that personal involvement in the SIP was indispensable to an executive's success at Comdisco. All of the after presentation activities by the members of the Board of Directors including private meetings, statements, lack of confidentiality, and the like, were intended to and did indicate that participation in the SIP program was essential to an employee's success at Comdisco. Those who witnessed or heard of such activities believed that to be the case.

58. The Board of Directors, with the knowledge and approval of Bank One, falsely represented to the employees including the Plaintiffs during the at the Palm Springs Retreat that whether the employee participated and the amount of the SIP loan assumed by each individual would remain confidential and not be disclosed to senior management. This false promise was essential to provide participants with comfort that senior Comdisco management could not monitor the extent to which SIP participants either purchased SIP stock or might later dispose of SIP stock. In fact, starting at the time of the Retreat, Nicholas Pontikes and other senior executives were advised of the level of individual SIP purchases. This information was used to later interfere with and inhibit SIP participants from disposing of Comdisco stock before the price dropped or while it was dropping.

59. The Board of Directors and Bank One also failed to disclose that the SIP was structured with the intent and purpose to inhibit participants from disposing of their stock before the end of five years, or leaving Comdisco's employment early. This structuring of the SIP meant that the employees would remain at extreme risk for five years, creating extraordinary and unreasonable pressure and incentive for employees to perform and remain on their jobs. In

16

addition to the terms of the SIP, the Board of Directors, and those acting at the Board of Directors' direction, also did everything possible to further inhibit SIP participants from disposing of their stock prior to the end of a five-year period in order to further manipulate the public price of the stock.

60.    The Board of Directors and Bank One represented to Plaintiffs that the Comdisco stock they were being sold pursuant to the SIP program was worth the same amount as Comdisco's publicly traded stock.  This representation was not true because the SIP stock was offered and purchased at the public market price, but could not be sold for one year, and thereafter was subject to other restrictive terms, all of which made the stock artificially overpriced at the time it was issued.  The true value of the stock offered by the Defendants was therefore misrepresented.

### The Coercive Pressure And Misrepresentations Yield Comdisco Over $100 Million

61.    The coercive and fraudulent scheme was so successful that Plaintiffs entered into margin loans that were far in excess of what the Plaintiffs could afford and which were not justified by the net worth of the Plaintiffs.  In at least one circumstance, an individual with liquid assets of less than $75,000 was fraudulently induced and coerced into a SIP loan of over $1,000,000.

62.    Under the conditions at the Retreat created by, and in reliance on the misrepresentations of, the Board of Directors and Bank One, Plaintiffs were fraudulently induced to execute a loan agreement with Bank One and were identified as the owners of restricted Comdisco common stock at the then market share price.  In all, 106 Comdisco employees signed loans for $109,000,000 – which means that the Plaintiffs were fraudulently induced and coerced into signing loans for an average amount of over $1,000,000 each.

### Plaintiffs Were Prevented From Selling Their Sip Stock And Avoiding Their Losses

63.    The SIP program was structured to inhibit and severely restrict the employees'

sales of the shares of Comdisco stock purchased under the SIP in the following ways:

(a)     The SIP participants were absolutely prohibited from selling their shares at any time within the first year of purchase;

(b)     The SIP participants were required to pay to Comdisco 50% of any gain on the sale of the shares if the shares were sold in the second and third year following the year of purchase;

(c)     The SIP participants were required to pay to Comdisco 50% of any gain on the sale of the shares if the participant left the employ of Comdisco within three years after the year of purchase;

(d)     The SIP participants were not allowed possession of the shares until the loan to Bank One was paid in its entirety;

(e)     The SIP participants were required to open an account with Bank One into which all dividends or other gain on the stock would be deposited directly by Comdisco for the benefit of Bank One, and would be automatically paid to Bank One as interest on the loans became due;

(f)     The SIP participants were required to notify Comdisco in the event they wanted to sell the SIP shares and to obtain approval from Comdisco to do so;

(g)     Any large sale of Comdisco stock was reported immediately to Nicholas Pontikes who in turned reported it to the employee's direct manager;

(h)     The SIP participants were prohibited from protecting themselves from loss through the use of "collars" and other hedging techniques;

(i)     The SIP loan had a significant prepayment penalty;

(j)     Comdisco held the SIP shares through an agent during the term of the SIP loans to insure the restrictions were enforced; and

(k)     Comdisco's directors were the designated SIP administrators. This allowed them to act arbitrarily and capriciously with respect to application of the SIP terms, including their decision to assume all or a portion of certain participants' SIP obligations while

failing to do so with respect to other SIP participants.

64.    Not only was the program structured to prevent the employees from selling their stock, but after the SIP stock was purchased, Nicholas Pontikes and the Board of Directors discouraged the sale of the SIP shares by representing that any sale of an employee's SIP stock was an act of disloyalty and would jeopardize that employee's career with Comdisco.  In order to discourage the sale of the SIP stock and further coerce SIP participants, on more than one occasion during 2000, Phil Hewes, who at the time was a Comdisco officer and a member of the Board of Directors for Comdisco, represented on behalf of the Board of Directors to more than one SIP participant that the sale of the stock by them would adversely affect the value of Comdisco and the company's image in the public market.  In this manner, the Board of Directors thereby further attempted to manipulate the public price of the stock.

65.    While they knew that Nicholas Pontikes lacked adequate experience to serve as chief executive officer, the Board of Directors failed properly to supervise Nicholas Pontikes when he took over as Chief Executive Officer.  As a result, the Board of Directors allowed Nicholas Pontikes to make statements to employees which misrepresented the value of Comdisco's stock. For example, during 2000, Nicholas Pontikes conducted private meetings with SIP participants at which he made affirmative representations that the stock was undervalued.  The representations by Nicholas Pontikes were false and were made to further inhibit and discourage SIP participants from selling SIP shares.

66.    In order to discourage the sale of the SIP stock, on one or more occasions in January or February 2001, after the price of the stock began to fall, Phil Hewes, on behalf of the Board of Directors, also falsely represented to the Plaintiffs that the Board of Directors would protect them from any losses in connection with the SIP.  Hewes and the other Board Members knew such statements would be passed on to the other SIP participants and Plaintiffs.  While the Board of Directors did have Comdisco assume the obligations of certain SIP participants, those assurances were false for Plaintiffs.  The Board of Directors failed to take the promised steps to protect all SIP participants and Comdisco is now looking to Plaintiffs for repayment of their SIP

loans.

67.    As a direct result of Hewes', Nicholas Pontikes' and other members of the Board of Directors' statements, these SIP participants and Plaintiffs were fraudulently induced not to sell their Comdisco stock in 2000 and 2001. Consequently, the Plaintiffs were effectively prevented during the five-(5) year term of the SIP from selling any of the Comdisco stock purchased as part of the SIP. If the Plaintiffs had sold the stock as late as 2000 and early 2001 they would have either made a profit or not have suffered such a financial loss on the SIP shares.

### Bank One Conceals Defendants' False Representations

68.    Beginning in 1998 through the summer of 2002, the members of the Board of Directors and Bank One engaged in conduct which fraudulently concealed the falsity of the Defendants' representations regarding the SIP and the illegality of the SIP program. Within approximately twelve (12) months of the SIP transaction, Bank One advised Comdisco and members of the Board of Directors as part of a power point presentation that it was no longer legal to do a transaction like the SIP transaction. In order to conceal the illegality of the original transaction, Bank One falsely claimed that any violation was due to a recent change in the law subsequent to the offering of the SIP shares. The Bank One statements, made for the purpose of concealing the fraud, were not true. On or about July 30, 2002, Comdisco filed an objection to the claim of Bank One in the Comdisco bankruptcy proceeding asserting for the first time in essence that Comdisco believed that the SIP transaction violated Section 7(d) of the Securities and Exchange Act of 1934, 15 U.S.C.§§ 78(g) and (d). Comdisco also admitted that its guaranty constituted a credit and as such it should have registered the SIP transaction.

### SCIENTER ALLEGATIONS

69.    As alleged herein, Defendants acted with scienter in that they either intentionally or with deliberate recklessness issued or disseminated public documents and statements in the name of Comdisco that were materially false and misleading and would be issued or

20

disseminated to Plaintiffs, and, intentionally or with deliberate recklessness, knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.  Defendants knew, or intentionally or with deliberate recklessness disregarded, that the SIP program violated securities laws and that the value of SIP stock in the SIP program was inflated.  As set forth elsewhere herein in detail, Defendants, either intentionally or with deliberate recklessness by virtue of their receipt of information reflecting the true facts regarding Comdisco, their control over, and/or receipt and/or modification of allegedly materially misleading misstatements or omissions about Comdisco both publicly and those made at employee meetings, and/or their associations with Comdisco which made them privy to confidential proprietary information concerning Comdisco, either intentionally or with deliberate recklessness, participated in the fraudulent scheme alleged herein.

### No Safe Harbor Exists

70.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Second Amended Complaint.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements upon which the Plaintiffs base their claims, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Comdisco who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF
### (Section 10(b) of the Securities Exchange Act of 1934 and
### Rule 10b-5 Thereunder – Fraud Against Board of Directors)

71.     Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 72 as if specifically set forth herein**.**

72.     During the relevant period of time, Board of Director Defendants each intentionally or with deliberate recklessness carried out a plan, scheme, and course of conduct which was intended to and did defraud and deceive the Plaintiffs, as alleged herein, to induce Plaintiffs to purchase the SIP stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, said Defendants acted as set forth herein.

73.     Board of Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberately reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omission were knowingly or deliberately recklessly made for the purpose and effect of concealing the true purpose and risk of Comdisco's SIP program from the Plaintiffs and artificially inflate the price of its securities, to induce purchase of the securities in the SIP program and to discourage the subsequent sale of the SIP stock.  If Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were at the very least deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking steps necessary to determine whether those situations were false or misleading.

74.     Plaintiffs did not know that the price of Comdisco's SIP shares was artificially inflated, did not know that the SIP program violated securities laws, did not know the true nature of the SIP program and did not understand the true risks associated with the SIP program. Plaintiffs directly or indirectly relied on either the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in statements by Defendants during the relevant time period.

75.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the price of the SIP shares was artificially inflated during the relevant time period and the infirmities in the SIP program remained undisclosed.  At the time the Board of Director Defendants disseminated the misrepresentations and omissions complained of herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known of Comdisco's true value of the SIP stock, known that the representations were in fact false and of the illegality and infirmities of the SIP program, which were not disclosed by Defendants, Plaintiffs would not have participated in the SIP program.

76.     By virtue of the foregoing, the Board of Director Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of said Defendants' wrongful conduct, Plaintiffs relied upon said Defendants and acquired Comdisco common stock as participants in the SIP program at artificially high prices in a program that violated securities laws and were damaged thereby.

### SECOND CLAIM FOR RELIEF
**(Section 10(b) of the Securities Exchange Act of 1934 and
Rule 10b-5 Thereunder – Fraud Against Bank One)**

78.     Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 79 as if specifically set forth herein.

79.     During the relevant period of time, Defendant Bank One intentionally or with deliberate recklessness carried out a plan, scheme, and course of conduct which was intended to and did deceive the Plaintiffs, as alleged herein by inducing Plaintiffs to purchase Comdisco's common stock at artificially-inflated prices, and inducing Plaintiffs to borrow money from Bank One.

80.     Defendant Bank One had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberately reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. Defendants' material misrepresentations and/or omission were knowingly or deliberately recklessly made for the purpose and effect of concealing the true purpose and risk of Comdisco's SIP program from the Plaintiffs and artificially inflating the price of its securities, inducing participation in the SIP program, inducing Plaintiffs to enter into loans with Bank One, and to discourage the subsequent sale of the SIP stock. If Defendant Bank One did not have actual knowledge of the misrepresentations and omissions alleged, they were at the very least deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking steps necessary to determine whether those situations were false or misleading.

81. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the price of the SIP shares was artificially inflated during the relevant time period and the infirmities in the SIP program remained undisclosed. Plaintiffs did not know that the price of Comdisco's SIP shares was artificially inflated, did not know that the SIP program violated securities laws, did not know the true nature of the SIP program and did not understand the true risks associated with the SIP program. Plaintiffs directly or indirectly relied on either the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or deliberately recklessly disregarded by Defendants but not disclosed in statements by Defendants during the relevant time period. Plaintiffs acquired Comdisco common stock as participants in the SIP program at artificially high prices in a program that violated securities laws and were damaged thereby.

82. At the time Bank One disseminated the misrepresentations and omissions complained of herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known of Comdisco's true value of the SIP stock and the illegality and infirmities of the SIP program, which were not disclosed by Defendants, Plaintiffs would not have participated in the SIP program.

83. By virtue of the foregoing, Bank One has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

84. As a direct and proximate result of Bank One's wrongful conduct, Plaintiffs

suffered damages in connection with their participation in the SIP.

### THIRD CLAIM FOR RELIEF
### (Section 20(a) of the Securities Exchange Act of
### 1934 – Controlling Person Liability Against Board of Directors)

85.     Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 86 as if specifically set forth herein.

86.     The Board of Directors, by virtue of their high-level offices, directorships, and the specific acts heretofore described, were controlling persons of Comdisco within the meaning of Section 20(a) of the Exchange Act.

87.     Pursuant to their positions of control, the Board of Directors possessed the power to direct, or cause the direction of, Comdisco's management, operations, business, and policies. As such, at all relevant times, the Board of Directors were controlling persons of Comdisco within Section 20(a) of the Exchange Act.

88.     Comdisco committed violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that:

(a)     Comdisco offered to sell and sold SIP stock and Plaintiffs purchased SIP stock, as described above;

(b)     Comdisco carried out a plan, scheme, and course of conduct which was intended to and did defraud and deceive Plaintiffs, as alleged herein, to induce Plaintiffs to purchase the SIP stock at artificially-inflated prices; and

(c)     Comdisco carried out this plan through various written and oral communications, described above.  These communications included untrue statements of material facts and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     The Board of Director Defendants had the power and influence, and exercised the same, to cause Comdisco to engage in the illegal conduct and practices complained of herein. .

90.     By reason of the conduct heretofore alleged, the Board of Director Defendants are

liable for the aforesaid wrongful conduct, and are liable to the Plaintiffs for damages which they suffered in connection with their purchases of the SIP shares.

## FOURTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Board of Directors)

91. Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 92 as if specifically set forth herein.

92. In addition to the fiduciary duty owed the Plaintiffs as shareholders, the Plaintiffs reposed trust and confidence in the individual members of the Board of Directors, as further described above. This trust and confidence was generated, in part, by a working environment in which the Board of Directors conveyed and encouraged the understanding that executives in the corporation were, and would continue to be, treated like family.

93. This attitude, approach, relationship and personal commitment had been started by the company's founder, Kenneth Pontikes, and was adopted and fostered by each member of the Board of Directors. This relationship of trust and confidence was restated and reinforced at the Retreat.

94. At the Retreat, with the assistance of Bank One, the Board of Directors traded upon continuous professions of loyalty made by the Board of Directors to the Plaintiffs, which professions included reinforcement of the family-like relationship and express assurances that the Board of Directors was committed to enhancing the involvement of the Plaintiffs in the principal decisions of the corporation. The opening line on the introduction of the SIP program was the words of founder Kenneth Pontikes, "We're building something here".

95. The Board of Directors and Bank One intentionally created a circumstance in which the manner that the SIP shares were offered placed the Plaintiffs in a vulnerable position. This vulnerability was created by the coercive circumstances under which the Plaintiffs were forced to make their decisions as to whether to participate in the SIP.

96. The Plaintiffs were forced to make this decision without adequate time for

reflection and in an environment in which the Plaintiffs were led to reasonably believe a decision not to participate at substantial levels would harm their careers.

97.     The structure of the SIP program was designed to, and did, enhance the Board of Directors' control over the Plaintiffs, and inhibit the Plaintiffs from voluntarily leaving the corporation.

98.     By representing that both the Board of Directors and Bank One had or would evaluate each Plaintiff's financial suitability to participate in the SIP program, and further jointly representing that the corporation retained the power to determine whether, and to what extent, any Plaintiff could participate in the SIP program, Bank One and the Board of Directors caused Plaintiffs to place trust in them and repose power in them over each Plaintiff.

99.     With the assistance of Bank One, the Board of Directors purposefully assumed a position of responsibility, trust, power and control over each of the Plaintiff's financial conditions.   The representations about the care that would be exercised in unilaterally determining the Plaintiffs suitability also further enhanced the relationship of trust and confidence the Plaintiffs had in Bank One and the Board of Directors.

100.     By exercising coercive power over each Plaintiff following the creation of the SIP program, the Board of Directors was able to control whether or not any Plaintiff felt free to sell SIP stock and leave the program.

101.     Based on the foregoing, the SIP participation was not the result of an arms-length negotiation or relationship.

102.     By creating the manner in which the SIP program was structured and offered, by further coercing Plaintiffs with regard to their continuing participation, and by doing the other acts described hereinabove, the Board of Directors became, and assumed the responsibilities of, fiduciaries to each SIP participant.

103.     As fiduciaries, each member of the Board of Directors had an obligation to favor the interests of each Plaintiff over the fiduciaries' own personal interest, had a duty of complete and accurate disclosure of information to each Plaintiff, had an obligation not to interfere with

each Plaintiff's unbridled exercise of contractual rights under the SIP program, had an obligation to supervise Nicholas Pontikes and other members of Comdisco executive management, and had an obligation to institute safeguards to protect all of the SIP participants prior to Comdisco filing bankruptcy. The Board of Directors knew that the employees had substantial holdings in Comdisco stock through other employee stock plans yet nevertheless further favored their self interest by pressuring the Plaintiffs to over invest in Comdisco stock by promoting the SIP program to further enhance the price of their own Comdisco stock.

104.    By engaging in the conduct described hereinabove and by failing to act in the best interest of the Plaintiffs as well as by failing to extend the same treatment to Plaintiffs as they had to other SIP participants, the Board of Directors violated their fiduciary duties to each Plaintiff.

105.    As a direct result of the Board of Directors' breach of their fiduciary duties, Plaintiffs suffered damages.

## FIFTH CLAIM FOR RELIEF
### (Fraud - Against all Defendants)

106.    Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 105 as if specifically set forth herein.

107.    At the time of the presentation of the SIP proposal, the Board of Directors knew or should have known that the Plaintiffs and other Comdisco employees would not have participated in the SIP if they were given adequate time and reasonable unpressured conditions to consider the excessive risk being forced upon them, or if the Board of Directors and Bank One had disclosed the true nature of the SIP program, or if the illegal margin nature of the SIP loans had been disclosed, or if the SIP participants had known that the Board of Directors was using the program to gain leverage over them as employees, or had known the significant risks of the Comdisco SIP over those of other SIP programs, or had known that the SIP program was being used to manipulate the stock price, or had known that the representations were not true that either

the Board of Directors or Bank One evaluate the SIP participant's financial suitability.

108.    Defendants, and each of them, intended Plaintiffs to rely upon the representations made, as described hereinabove, to induce participation in the SIP program and to obtain forbearance from later sale of SIP shares.

109.    As a direct result of the false representations of fact, Plaintiffs reasonably relied upon such representations and elected to participate in the SIP program and purchase Comdisco shares at the then public market price with this purchase being funded 100 % by five (5) year negatively amortized unsecured loans from Bank One.  Based upon such further fraudulent conduct as described herein, Plaintiffs were induced to forbear from later selling such shares.

110.    As a direct result of their participation in the SIP program, Plaintiffs over paid for the SIP shares and have further been injured because they are now being pursued by Comdisco's Litigation Trustee for over $46 million (in the aggregate) for purchase of Comdisco common stock, which has little value after the fraud of the Board of Directors.  Plaintiffs have incurred and will continue to incur substantial fees and costs related to this SIP participation.

### SIXTH CLAIM FOR RELIEF
**(Negligent Misrepresentation Against Board of Directors)**

111.    Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 110 as if specifically set forth herein.

112.    In authorizing, overseeing and promoting the creation of the SIP, the Board of Director Defendants conveyed false information to the Plaintiffs and should have known that the SIP loans by Bank One to the Plaintiffs were in violation of state and federal Securities laws.

113.    The Defendants had a duty and obligation to fully inform the Plaintiffs about the SIP legalities and infirmities as well as the true value of the stock.

114.    The Defendants had a duty and obligation to fully inform the Plaintiffs about the true value of the restricted stock sold through the SIP program, the true intent of the SIP program, and the substantial risk of the SIP program as compared to other SIP programs.

115.     To the extent that the Defendants disclosed additional information beyond that which they had a duty to disclose, they had an obligation to fully and honestly make such representations so as not to mislead the Plaintiffs.  Defendants made material misrepresentations and omissions regarding the SIP program, the value of the stock, and misdirection of the corporate assets.

116.     By engaging in the conduct described above, the Board of Directors breached their duty to refrain from making misrepresentations to Plaintiffs.

117.     As a direct result of the Defendants' failure to inform Plaintiffs of true facts regarding the SIP loans, participation in the SIP, information regarding Comdisco, and other information as described hereinabove, Plaintiffs were harmed in that they participated in the SIP program, and are now holding Comdisco stock that is virtually worthless.

**SEVENTH CLAIM FOR RELIEF**
**(Cal. Corp. Code § 25401 – Misstatement or Omission of Material Facts by All Defendants)**

118.     Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 117 as if specifically set forth herein.

119.     Defendants committed violations of Cal. Corp. Code § 25401 by carrying out a plan, scheme, and course of conduct which was intended to and did defraud and deceive Plaintiffs, as alleged herein, to induce Plaintiffs to purchase the SIP stock at artificially-inflated prices and induce Plaintiffs to borrow money from Defendant Bank One.  Defendants carried out this plan through various written and oral communications, described above.  These communications included untrue statements of material facts and/or failure to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

120.     Specifically, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in such communications, or acted with deliberately reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such

30

facts were available to them. Defendants' material misrepresentations and/or omissions were knowingly or deliberately and recklessly made for the purpose and effect of concealing the true purpose and risk of Comdisco's SIP program from the Plaintiffs and artificially inflating the price of securities, inducing purchase of the securities in the SIP program, and discouraging the subsequent sale of the SIP stock. If Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were at the very least deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking steps necessary to determine whether those situations were false or misleading.

121. At all relevant times, Defendants and Plaintiffs conducted the SIP stock transactions in California.

122. As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.

**EIGHTH CLAIM FOR RELIEF**
**(Cal. Corp. Code § 25403 – Inducement or Assistance or Indirect Performance of Act to Violate Cal. Corp. Code § 25401 By All Defendants)**

123. Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 122 as if specifically set forth herein.

124. Defendants committed violations of Cal. Corp. Code § 25403:

(a) Defendant Board of Directors with knowledge directly or indirectly controlled and induced others to commit the violations of Cal. Corp. Code 25401 described in the Seventh Claim for Relief by controlling Comdisco and inducing it to commit these violations by exercising control over the day-to-day business of Comdisco and making and supervising specific individual decisions about the conduct of such business.

(b) Defendant Board of Directors with knowledge substantially and materially assisted others who committed the violations of Cal. Corp. Code § 25401 described in the Seventh Claim for Relief.

(c) Defendant Bank One with knowledge directly or indirectly controlled and

induced others to commit the violations of Cal. Corp. Code 25401 described in the Seventh Claim for Relief and substantially and materially assisted Comdisco and Defendant Board of Directors in its plan, scheme, and course of conduct which was intended to and did defraud and deceive Plaintiffs, as alleged herein, by inducing Plaintiffs to purchase the SIP stock at artificially-inflated prices, and inducing Plaintiffs to borrow money from Defendant Bank One.

125. As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiff and other Class members suffered economic injury.

### NINTH CLAIM FOR RELIEF
**(Cal. Corp. Code § 25504 – Controlling Person Liability Against Board of Directors for Comdisco's violations of Cal. Corp. Code § 25401)**

126. Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 125 as if specifically set forth herein.

127. Comdisco committed violations of Cal. Corp. Code § 25401:

(a) Comdisco offered to sell and sold SIP stock and Plaintiffs purchased SIP stock, as described above. In effecting the SIP stock transactions, Plaintiffs purchased SIP stock within the meaning of Cal. Corp. Code § 25501;

(b) Comdisco carried out a plan, scheme, and course of conduct which was intended to and did defraud and deceive Plaintiffs, as alleged herein, to induce Plaintiffs to purchase the SIP stock at artificially-inflated prices;

(c) Comdisco carried out this plan through various written and oral communications, described above. These communications included untrue statements of material facts and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d) At all relevant times, Comdisco and Plaintiffs conducted the SIP stock transactions in California;

128. Comdisco is civilly liable under Cal. Corp. Code § 25401:

(a) Plaintiffs purchased SIP stock;

(b)     Plaintiffs were unaware of the facts concerning the untrue statements or omissions of material facts; and

(c)     Defendant Board of Directors either (1) knew the facts concerning their untrue statements or omissions of material facts, or (2) did not exercise reasonable care to discern those facts, and, if they had, they would have known such facts.

129.     Defendant Board of Directors are liable to Plaintiffs because they were Comdisco directors within the meaning of Cal. Corp. Code § 25504 and Defendant Board of Directors knew of and/or had reasonable grounds to believe in the existence of the facts alleged in this Claim for Relief.

130.     As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.

### TENTH CLAIM FOR RELIEF
**(Cal. Corp. Code § 25504.1 – Joint and Several Liability of Board of Directors for Materially Assisting in Violations of Cal. Corp. Code § 25401)**

131.     Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 130 as if specifically set forth herein.

132.     Defendant Board of Directors with knowledge substantially and materially assisted in Comdisco's violation of Cal. Corp. Code § 25401, as described in the Seventh Claim for Relief, in its plan, scheme, and course of conduct which was intended to and did defraud and deceive Plaintiffs, as alleged herein, by inducing Plaintiffs to purchase the SIP stock at artificially-inflated prices, and inducing Plaintiffs to borrow money from Defendant Bank One. Specifically, Defendant Board of Directors had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

133.     At all relevant times, Defendants and Plaintiffs conducted the SIP stock transactions in California.

134.    As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.

### ELEVENTH CLAIM FOR RELIEF
**(Cal. Corp. Code 25504.1 – Joint and Several Liability of Bank One for Materially Assisting in Violations of § 25401)**

135.    Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 134 as if specifically set forth herein.

136.    Defendant Bank One with knowledge substantially and materially assisted in Comdisco's and Defendant Board of Directors' violation of Cal. Corp. Code § 25401, as described in the Seventh Claim for Relief, in its plan, scheme, and course of conduct which was intended to and did defraud and deceive Plaintiffs, as alleged herein, by inducing Plaintiffs to purchase the SIP stock at artificially-inflated prices, and inducing Plaintiffs to borrow money from Defendant Bank One.  Specifically, Defendant Bank One had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

137.    At all relevant times, Defendants and Plaintiffs conducted the SIP stock transactions in California.

138.    As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.

### TWELFTH  CLAIM FOR RELIEF
**(Breach of Covenant of Good Faith and Fair Dealing Against Board of Directors)**

139.    Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 138 as if specifically set forth herein.

140.    Pursuant to the contractual relationships between Plaintiffs and the Board of Director Defendants by virtue of the SIP program, the Board of Director Defendants had a duty to deal in good faith with the Plaintiffs.

141.    The Board of Directors breached their duty to act in good faith by interfering with Plaintiffs' exercise of their rights to dispose of SIP stock, by failing to properly and fairly implement the terms of the SIP Program with respect to all SIP participants and by failing to adequately supervise Nicholas Pontikes and other executive officers in connection with their administration of the SIP Program.

142.    As a direct and proximate result of Board of Directors' breach of the duty to act in good faith, the Plaintiffs have been harmed.

### THIRTEENTH CLAIM FOR RELIEF
**(Declaratory Judgment Against all Defendants)**

143.    Plaintiffs hereby reallege and re-avers each of the allegations set forth in Paragraphs 1 through 142 as if specifically set forth herein.

144.    An actual controversy exists within this Court's jurisdiction regarding the rights of the Plaintiffs with respect to the alleged obligations of the SIP participants under the SIP loans, which Comdisco's Litigation Trustee asserts was assigned to it under the terms of Comdisco's settlement with Bank One.  The Plaintiffs assert that they are entitled to indemnification from each of the Defendants with respect to any and all SIP obligations.  The Defendants have thus far failed to indemnify and defend the SIP participants from any claims by Comdisco and its Litigation Trustee in connection with the SIP loans.

145.    Although from at least July, 2002 through October, 2004 Comdisco maintained that the SIP program was void and unenforceable, Comdisco's Litigation Trustee has filed collection actions against the Plaintiffs with respect to the SIP Notes.  It filed its actions in the Northern District of Illinois and the Circuit Court of Cook County Illinois against all of the Plaintiffs on or about February 4, 2005.

146.    Plaintiffs, pursuant to 28 U.S.C. §2201, are entitled to a declaration of their legal rights.  This Court should hold that Defendants are required to indemnify and defend the Plaintiffs for any and all of their obligations under the SIP loans and their attorney's fees and

costs in challenging those illegal transactions.

## FOURTEENTH CLAIM FOR RELIEF
### (Illinois Consumer Fraud and Deceptive Trade Practices Under 815 ILCS 505/1, et seq.)

147.    Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 146 as if specifically set forth herein.

148.    Defendants committed violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, et seq., that protects consumers from fraudulent and deceptive sales and marketing schemes including those related to the sales of securities. Violations of the Act included carrying out an unfair or deceptive plan, scheme, and course of conduct which was intended to and did defraud and deceive Plaintiffs, as alleged herein, to induce Plaintiffs to purchase the SIP stock at artificially-inflated prices and induce Plaintiffs to borrow money from Defendant Bank One.  Defendants carried out this plan through various written and oral communications, as described above.  These communications included untrue statements of material facts and/or omissions of material facts concerning the true purpose of, and risks associated with, Comdisco's SIP program.

149.    Defendants used and employed such deceptive and fraudulent means with the intent that Plaintiffs rely on the concealment, suppression or omission of such material facts.

150.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in such communications   Defendants' material misrepresentations and/or omissions were knowingly made for the purpose and effect of concealing the true purpose and risk of Comdisco's SIP program from the Plaintiffs and artificially inflating the price of securities, inducing purchase of the securities in the SIP program, and discouraging the subsequent sale of the SIP stock.

151.    As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.

## FIFTEENTH CLAIM FOR RELIEF
### (Illinois Securities Fraud Under 815 ILCS 5/1, et seq.)

152.     Plaintiffs hereby reallege and re-aver each of the allegations set forth in Paragraphs 1 through 151 as if specifically set forth herein.

153.     Defendants committed violations of the Illinois Securities Law (815 ILCS 5/1, et seq.) by engaging "in a transaction, practice or course of business," as alleged herein, "in connection with the sale of securities which works or tends to work a fraud or deceit upon the" purchasers and Plaintiffs.  (815 ILCS 5/12F).

154.     Defendants committed further violations of the Illinois Securities Law by obtaining money through the sale of securities by means of untrue statements of material fact and/or failure to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.  (815 ILCS 5/12G).

155.     Defendants committed further violations of the Illinois Securities Law by employing a "device, scheme or artifice to defraud in connection with the sale" of a "security, directly or indirectly."  (815 ILCS 5/12I).

156.     Specifically, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in such communications.  Defendants' material misrepresentations and/or omissions were knowingly made for the purpose and effect of concealing the true purpose and risk of Comdisco's SIP program from the Plaintiffs and artificially inflating the price of securities, inducing purchase of the securities in the SIP program, and discouraging the subsequent sale of the SIP stock.

157.     As a direct, foreseeable, and proximate result of this wrongful conduct alleged herein, Plaintiffs suffered economic injury.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts alleged in their Second Amended Complaint.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on their behalf and against Defendants as follows:

(a)     Awarding compensatory damages in favor of Plaintiffs and against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, as alleged above, in an amount to be proven at trial, including interest thereon;

(b)     Declaring that Defendants are required to indemnify the Plaintiffs for any and all obligations under the SIP loans and their attorney's fees and costs in challenging those illegal transactions or defending claims arising out of these actions;

(c)     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Declaring the legal rights of the Plaintiffs and, *inter alia*, requiring. Defendants to indemnify and defend the Plaintiffs against any and all claims regarding any SIP obligation and reimbursement of their attorney's fees and costs in challenging those illegal transactions; and

     (e)     Awarding such other further relief as the Court may deem just and proper.

Dated:  December 29, 2005

                              BRYANT COLLINS, DAVID COONS, CHARLES DALE,
STEVEN DAVIS, JAMES DUNCAN, HAROLD FINKEL,
VICTOR FRICAS, THOMAS GAZDZIAK, GREGORY
GIFFORD, ALLAN GRAHAM, STEVEN GRUNDON, JULIUS
HALLER III, JOSEPH HOLD, JAMES HYLAND, JAMES
JENKS, DAVID KEENAN, JEFFREY KNAUS, MICHAEL
McFARLAND, STEVEN McFARLAND, ANDREW MITZEN,
CHARLES NEFF, KEITH OLENEK, LYSSA KAYE PAUL,
MICHAEL POISELLA, THOMAS PRENDERGAST, DEAN
PROKOS, MICHAEL ROSS, PAUL SANFILIPPO, JEFFREY
SCHWIERING, JOSEPH SCOZZAFAVA, ROBERT SIBIK,
MARK STACHULSKI, CHARLES STEVENS, THOMAS
VALLONE, GREGORY WEISS, BRADFORD WHEATLEY,
JEFFREY WOLINSKI, IRA WOOLWICH,
                Plaintiffs

                          By:  _/s/ Gini S. Marziani_____
                                One of Their Attorneys

SHARTSIS, FRIESE LLP
ARTHUR J. SHARTSIS (Bar #51549)
(admitted Pro Hac Vice)
JAHAN P. RAISSI (Bar #168599)
 (admitted Pro Hac Vice)
One Maritime Plaza, 18th Floor
San Francisco, California  94111
Telephone:  (415) 421-6500
Facsimile:   (415) 421-2922

DAVIS McGRATH  LLC
GINI S. MARZIANI (Bar # 3127421)
CHAMP W. DAVIS, JR. (Bar # 587192)
BARBARA J. MULVANNY (Bar # 6188621)
125 South Wacker Dr., Suite 1700
Chicago, IL  60606
Telephone:  (312) 332-3033
Facsimile:   (312) 332-6376

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

Gini S. Marziani, an attorney, certifies that copy of the foregoing Second Amended Complaint was served upon all parties listed below through the Court's electronic filing system, or, for those counsel not registered with the Court's electronic system, by mailing a copy via U.S. Mail from 125 South Wacker Drive, Chicago, Illinois 60606, on or before December 30, 2005.

Daniel Arlen Zazove
Christopher B. Wilson
PERKINS COIE LLP
131 South Dearborn St.
Suite 1700
Chicago, IL 60603

David T. Biderman
PERKINS COIE LLP
1620 26th Street
6th Floor
Santa Monica, CA 90404

Nathan P. Eimer
Adam B. Deutsch
EIMER STAHL KLEVORN & SOLBERG
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Daniel Patrick Dawson
Jessica Renee Falk
William J. Raleigh
NISEN & ELLIOTT
200 West Adams Street
Suite 2500
Chicago, IL 60606

David E. Bennett
Timothy J. Carroll
VEDDER, PRICE, KAUFMAN,
 & KAMMHOLZ, PC
222 North LaSalle Street
Suite 2600
Chicago, IL 60601

Robert S. Stern
Nancy R. Thomas
MORRISON & FOERSTER LLP
555 West 5th Street
Suite 3500
Los Angeles, CA 90013


Respectfully Submitted,

DAVIS McGRATH LLC


By: /s/ Gini S. Marziani


Gini S. Marziani
Davis McGrath LLC
125 S. Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 332-3033